Ms. Durbin. Good morning. May it please the Court, my name is Anna Durbin. I represent Douglas Edwards. I'd like to reserve two minutes for rebuttal argument, if possible. That request will be granted. Now, I did not try this case, but I was appointed to represent Mr. Edwards at sentencing and on appeal after prior appointed counsel was granted leave to withdraw. This is a case charging possession of a weapon by a convicted felon. The defense at trial was that Mr. Edwards did not know there was a gun hidden out of sight in his car under the dashboard. And there was evidence that his former girlfriend, Dawn Matthews, also had motive and opportunity to plant the gun there. She called the police on 9-1-1 and told them that he had hit her in the eye. This allegedly occurred after she had pulled his fiancé out of his car and beat her up. And Mr. Edwards then pulled Matthews. Mr. Edwards, we're familiar with the facts. Why don't you not waste your time on that and While Mr. Edwards was denied a fair trial, when the prosecution, which knew or should have known about breeding material, failed to turn it over to the defense, which had specifically requested it. While questioning also, while questioning its principal witness, Dawn Matthews, also known as Robinson, the prosecution brought out testimony from the witness that she did not tell the police about a gun until after Mr. Edwards was stopped near his uncle's home after a car chase. The prosecution did not correct that testimony, which it should have known was belied by the breeding material. She told Officer Fidler, the first one who responded to the 9-1-1 call, something about a gun. And He didn't remember affairs people sometime after this. And he remembered something about a gun. And he also told Sergeant Costello about the gun. And he then went off duty at 1145 a.m. And his recollection when he gave that statement was relatively vague, was it not? It was relatively vague, but it certainly was something that should have been known to the defense. They could have called him. I didn't understand something, though. It's clear that before the gun was ever found, she told the police about it. Yes, she did. What wasn't so clear was whether she told them after she first left the police station or earlier in her appeal. And your theory of the case is that, well, maybe it was her gun and there's a reasonable doubt about it. But why would it have made it? I mean, because she knew and she didn't get the information from the police. So it's clear that without help of anyone else, she knew that this man had a gun. Why would it have been more likely to think that she planted it if she talked about it earlier rather than later? Because I would have thought myself that if she talked about it... I mean, I just don't quite understand it. Well, the prosecution... What's the evidence? Because it's clear that she knew about the gun and no one could have told her about it. Either way. She knew about the gun and our theory was that she planted it there. And that's why she knew about it and she knew where it was. Fine. I understand that. The prosecution's argument was that she didn't tell the police about the gun until they apprehended him in his car. But why would it have mattered if she told them sooner? It would have mattered because the prosecution was arguing that if she had intended to get him in trouble by planting a gun in the car, that would have been the first thing she would have told the police that there was a gun in his car. And in fact, she did tell Officer Fidler that there was a gun. She also told Officer Flagler when he first picked her up, when she first ran to him outside the police district, that there was a gun because he put out a flash on the radio that there was a gun, which was heard by officers Kelly and Let me interrupt you, Ms. Durbin. This is Judge Alderson. Yes, Your Honor. Earlier, it's your theory that it was her gun and she planted it. And you used the expression she had motive and opportunity to have a gun. Yes, Your Honor. Now, what evidence do you have that she actually did this? Well, there was a witness for the defense, Your Honor, who was walking her dog, and that was Karen Cheatham. And she testified that she saw Ms. Matthews leaning over with the gun. She didn't see her put a gun there, but she saw her doing something with the car open, car door open. And that is your evidence? Well, there was no evidence tying Mr. Edwards to the gun other than Ms. Matthews' testimony and the fact that it was found completely hidden in his car. There were no fingerprints. Well, but that's a big other. It was found hidden in his car, and he was driving the car, and the weapon was, as I understand it, it was under the dashboard on the driver's side. That's right, where no one could see it. The police didn't see it when she told them it was there. No one could see it conveniently. No one could see it. But Mr. Edwards was driving and had  So how would have they led to a reasonable probability of a different result? Part of the issue was also the crucial credibility issue of Ms. Matthews or Robinson. Why? And she's the only one who said that Mr. Edwards, it was Mr. Edwards' gun. Apparently, from what the government says in their brief, and if you look at this case, if they hadn't been able to find Ms. Robinson prior to trial, which they had some trouble locating her, couldn't the government have gotten a conviction based on the fact that they stopped Mr. Edwards, they searched his car, they found the gun, and they submitted his prior record to the jury? Wouldn't that have been enough? No, it wouldn't have been, Your Honor, because part of constructive possession is he has to know the gun is there. And that was another problem in this case in that the constructive possession instruction by the court was very garbled and it made it very difficult to understand what the jury had to find. The jury could have found him guilty just because the gun was in his car. Correct. But if he didn't know the gun was in his car, then there was no constructive possession, even though he had possession of the car and control of the car. But the jury returned a guilty verdict. Yes, they did, but they returned a guilty verdict without crucial testimony which could have more thoroughly contradicted this witness. This witness should have had her testimony that she did not tell the police until they apprehended him about the gun, corrected by the prosecution, and then the prosecution exploited her testimony that they elicited that she didn't tell anyone about a gun. She didn't tell anyone until Flagler at the time they arrested him. The prosecution exploited that in its closing and rebuttal argument saying if she had planted this gun, she would have told them the first thing about the gun. She certainly wouldn't have told them she planted it, but she would have told them about the gun. And she did tell them about the gun. She told Fiddler. She told Flagler. It went out on the flash that there was a gun. So that completely vitiates that argument of the prosecution. Now, the prosecution has come back in its reply trying to say, well, actually, she didn't tell them that she had a gun under the dash, that he had a gun hidden under the dashboard. But that's not what they argued to the judge. I'm interrupting you again. Of course you are. As I understand your argument on this constructive possession, you are saying in order to establish constructive possession, the person must have knowledge of the felon. Yes, sir. In our cases, we don't say that. We say normally has both the power and the intention at a given time to exercise dominion or control either directly or through another person or persons. Using that as a template, how do you address your argument? Well, Your Honor, you can't have intention to control something unless you know it's there. And you can't have dominion over it unless you know it's there. And I think our cases discussing constructive possession have made that point. Is your argument, then, that irrespective of any charge, as a matter of law, there could not be constructive possession in this case? Unless a jury found that he was going to sit. How about you answer the question yes or no. That's your point. My point is that constructive possession... I want you to say whether that is your point. And if that is your point, I want you to set forth the applicable rule of law that we should initiate in an opinion satisfying your contention. All right. The rule of law is that there can't be constructive possession unless the person is aware of the presence of that which he's supposedly possessing. And we have said that. This court has said that in drug cases where people were in an apartment but didn't know there were drugs hidden in a closet that they didn't have access to. I will simply say to you that it's been my experience a long time on the bench that in generally even where a pistol is found in a bedroom, for example, usually, if not invariably, the defendant denies, oh, I didn't know it was there. I don't know anything about it. Well, Your Honor, that comes usually from the fact that that's where the defendant lives and it's usually on a bedside table or under the mattress and it's not... And here we have Edward's car and here we have the pistol not only in the car, in the dashboard near the driver's, on the driver's side. Now, what difference is that in a bedroom? The difference is that it was not easily accessible and it was not even viewable to the police who went in and looked for it after she told them it was there. And that is much different from being able to just easily access a gun sitting on a bedside table or in a drawer next to the bed. And when you combine that with the evidence that someone saw her leaning down near that area, I think there has to be some... I think it makes her testimony about the gun much more crucial and it makes her credibility much more crucial. And if the government had done the right thing, which is to either turn this over so that counsel could have prepared the trial better or had corrected her when she gave the false testimony and not exploited that false testimony in argument, the result in this case definitely could probably have been different because it went to the heart of her credibility. How about this juror? The juror you say was excused because of her race. She was an African-American. Because she was old and African-American. And the cases that the government relies on to say that age is not a problem in terms of peremptory challenges relied on cases where they were striking younger jurors. There is no law that puts younger jurors in a protected category. But anyone over 40, Your Honor, is in a protected category under the Age Discrimination and Employment Act. She was 70 and had been in politics. Of course, if you took that standard and you applied it to this panel, it would be a little... Not to mention that the school court is supposed to be non-partisan. Just like the court. That's right, Your Honor. Excuse me. One of your combination of reasons. One, that she was old. And secondly, she was a member of a school board and that the government didn't want any political figures on the jury. Wasn't it more than age? Your Honor, I think that taking people off the jury because they have engaged in the civic life of the community is a really bad idea. And certainly there was nothing to say that she was... Excuse me. Excuse me. As to your argument on age, as well as the argument you're making now, it isn't important whether those ideas are good ideas or bad ideas. The point is they were ideas for reasons other than racial discrimination. They were ideas that were combined with racial discrimination in that she took this woman off and she was one of the few remaining African Americans. And there is a category of older women or elderly women, African American, which courts have recognized is susceptible to discrimination. And what it does when you say, I don't want older people on the jury and you know nothing more about them in terms of their ability to be open-minded or to hear because they ask no follow-up questions of this woman, what you're doing is you're denying older jurors their right to equal protection and to be on juries. And there was no evidence of current involvement in politics or even what this woman's politics were. The school board is a non-partisan entity. People don't run as a party member for that. I understand your position. That to me is pretextual, Your Honor. And really the reason was she wanted to get her off because she was older and African American. I just had one question. I know you're challenging, one more question, you're challenging the limitations under the guidelines. You're just saying there's a broader picture than the guidelines. Sometimes we get an appeal and somebody says, well, you said that the person should have a, the trial court said there was a two-level increase for obstruction of justice. And we don't think there was obstruction of justice. But in this case, I gather because it's a career offender category, you're not challenging the actual numbers reached in the range. Well, what I'm saying, Your Honor, is that they over-emphasized and over-represented the seriousness of his record to put him in the career offender status. You don't think he was a career offender? His drug charges were very small, but they were enough to make them applicable drug charges. On the other hand, the career offender guideline is, again, not a mandatory guideline. And we made arguments that because of his age and his marriage and the studies of the older and so forth, that the court should consider that and instead of applying the career offender guideline, apply the guideline without that enhancement, which would then still result in a very heavy sentence of 15 years under the mandatory. But I just want to get this clear. What you're saying is, while it's true that technically he came in the guideline, that should have been not controlling here. That is correct, Your Honor. See, that's a distinction to say, although he's not a career offender because he didn't have the prior offenses, but that's not the argument. The argument is, even if he's technically in it, when you look at the larger picture under 3553, the sentence is too long. That is correct. And this court has recently held that judges have to make specific findings if there is a contested issue. And the court did not have the benefit of that particular setup from this court at the time, but she did not make a particular finding about his age, his likelihood of recidivism. She didn't go through the procedure that Judge Jordan set out in the Goff case. All right, Ms. Gerber, we'll have you back on the phone. Thank you very much, Your Honor. Ms. Grigsby. May it please the court, I'm Karen Grigsby for the government. The defendant contends here this morning that the government withheld crucial evidence that the complainant, Don Matthews, had told officers Flagler and other officers on the scene about that the defendant had a gun. That is absolutely not the record. The government absolutely disclosed that evidence pretrial. The government disclosed pretrial the computer-assisted dispatch in this case, about which the defense complained this morning. That was disclosed pretrial. It's listed in the discovery record, in the discovery letter that is included in the record. That computer-assisted dispatch reflected that after Ms. Matthews left the police station that morning and saw the defendant drive by and grabbed Officer Flagler, she got in his car, and five minutes after getting in his car, they broadcast that Edwards was known to carry a gun. That was turned over pretrial. The government also disclosed pretrial the memo that Officer Flagler prepared within an hour of this incident, in which he said that once they got to 9th and Oak Lane and saw the defendant running down the street, he jumped, he, Officer Flagler, jumped out of the car to arrest the defendant. The complainant, Don Matthews, yelled, watch out, be careful, he might have a gun on him. Yes, that is the pertinent question. What we didn't disclose, what was not disclosed here, and again, as Your Honor, Judge Fischer observed, it was inadvertent, and it was found by the lower court to be inadvertent, but it should have been turned over, and we acknowledge that. The two things that should have been turned over, the only two pieces of giglio evidence here that are at issue are two sentences, one in the statement of Officer Fiddler to Internal Affairs. Officer Fiddler, as Judge Fischer commented, when he was interviewed by Internal Affairs, they asked him, did Ms. Robinson tell you that police officer, we've redacted the name, gave her boyfriend, Douglas Edwards, a gun? And in response, he says, I do recall the complainant mentioning something about the gun, but I don't recall any specifics. That's it. Is that in the police station? No, this was a comment that, well, it doesn't explicitly say. In other words, her theory is, Ms. Durbin's theory is, well, the complainant here set him up, and the fact that from the word go, she was yelling he had a gun, tends to support that, whereas if she set him up and he didn't say anything, she didn't say anything about the gun, then it would seem that maybe she didn't set him up, and that the earlier that she told the police about the gun, the more likely it is that it was a setup. Now, this might be, the whole thing may be far-fetched, I understand that, but that's the argument. But wouldn't that be true that if it was a setup, from the word go, he would be telling the police he's got a gun stashed? That would be the theory, that if it was a frame-up, she would have planted the gun and then immediately told the police, and instead what the record shows is that she called 911. We have the computer-assisted dispatch. There is nothing in that record about a gun. It is a domestic abuse call. It's coded as Priority 3, a house disturbance, not Priority 1, which would be a gun call. She is met by, in response to that call, Officers Latour and Fidler. Officer Latour did not recall Ms. Matthews saying anything about a gun, and Officer Fidler, as we've just said, recalled something vague. He had a vague recollection that she said something about a gun. And so that, therefore, when she first had contact with the police, as opposed to just talking on the phone to whoever answers the call, there's evidence that she mentioned the gun at that time, although it's vague. It's vague, and it could have been mistaken, first of all. It could have been mistaken. Secondly, it's certainly not, he has a gun, it's in his car, it's under the dash. They fell out. Fidler and Latour prepare, as they are required to do, a police incident report, a 7548. There is nothing in that about a gun. Presumably, if she had told them about a gun, I mean, that is vitally important to police officers. Somebody's going to be going out to arrest this man. They're going to want to know, is he armed? Absolutely, Officers Fidler and Latour, one would expect, would put in their report armed. There's nothing in their report about a gun. There's nothing in their report about a car. There's nothing in their report that he owns a car, drives a car, or what it is. It is simply a physical assault, punch in the eye. Ms. Grigsby, one issue that does bother me about the material that was not disclosed is its relationship to the comment by the Assistant U.S. Attorney in the closing argument. Yes, Your Honor, in closing argument, there are four references, and there is five, if you count a parenthetical reference, to her not reporting the gun or until she happens to see Mr. Edwards drive by. And four of those five references are actually completely correct and consistent with all of the evidence, both that which was not disclosed and that which was. But what about the fifth? The fifth, okay, the fifth is actually the first in the record. In closing argument, the AUSA, who actually was my co-counsel, said, when she calls 911 and the first officer comes in response, she says nothing about a gun. So that is the single sentence in closing that is inaccurate. And it was, first of all, it was actually true as to 911, and it was true as to Officer Latour, and it's only not true as to Officer Pippa. Obviously, in a closing argument, counsel raises and refutes a lot of points and discusses their theory of the case and why the jury should return a conviction. But the assistant U.S. attorney, trial counsel in this case, thought it was important enough to emphasize that point. Yes. And, you know, this is a, the Brady test and the Giglio test present a difficult standard. You know, we're looking at is there a reasonable probability of a different result as this information has been presented. And I'm not quite sure how you define that standard other than the statement that I just made. But doesn't this come very close to something that had not been used may have changed the result? Your Honor, I really don't think it does. The district court here, which heard all of the trial evidence, heard Ms. Matthews testify, heard Ms. Cheatham testify. The district court also, there were extended proceedings below on this issue, and so the district court reviewed the entire I.A.D. file, knew what was produced pre-trial, and the two things that were withheld. The entirety of the evidence here is not just that she says nothing to 911, that she says nothing to Officer Latour, that there is nothing about a gun in the 48. She then goes to the police station. She speaks with Sergeant Costello. She says nothing to Sergeant Costello. Later, Costello hears something from Cy Botham, so he has knowledge, but she doesn't say anything to Costello. She fills out a written complaint against police about the Officer G. She says nothing in her written complaint about a gun. She makes an offhand comment to Cy Botham, sort of as one more thing she's complaining about, but she says nothing in the written complaint about the gun. She then goes upstairs and meets at length with Detective Mayer, who photographs her and takes a signed statement from her, counsels her on protection from abuse orders, gives her advice about shelters. She says nothing to him about a gun. She doesn't even say anything to him about Edwards having a car, what kind of car. She mentions that he left her in a car, that he got in his car and drove away. She doesn't say anything about a gun to Detective Mayer. Detective Mayer is going to be the person who prepares whatever arrest warrants are prepared for whatever charges. If a search warrant were to be prepared to search a particular place, a house, a car, whatever, he would have done that. She says nothing to him about a gun or a car, anything. She then leaves the police station and sees Edwards drive by and, as was made clear in the pretrial discovery, although it didn't come in at trial because it would be prejudicial for the government to introduce it, she knew he was on parole. She sees him drive by. She is terrified because now he sees her. He knows that she has gone to the police about being punched in the eye and this is going to cause a problem. She is extremely upset. She grabs Flagler, and the evidence is that five – you know, the CAD shows Flagler broadcasts that he has encountered this woman and he's put her in the car and they're going to go look for the guy who punched her in the eye. Five minutes later, he broadcasts Douglas Edwards is known to carry a gun. So once again, she's not at that point. He's not saying – she says the gun's in the car. They get to make the no-blame and Officer Flagler's statement is that when he gets out of the car – she doesn't say he's got a gun in the car. She says be careful. He might have a gun on him. Let me ask you something. The gun, of course, was recovered. Yes. Was there any effort made to determine where the gun had come from? I mean, the provenance of the painting, you know. Yes, Your Honor. Was there any evidence about that? In other words, you might be able to show that a gun was sold by a particular dealer or something. The gun was traced, as all guns are, and it had been reported stolen in Westchester. And that was evidence that, of course, did not come in at trial. So the gun was stolen. Yes. So that you really couldn't – it didn't help much, then, as to where it could – it's not like the gun couldn't show the path of custody for manufacturing law. Well, it certainly wasn't registered to him since he was a convicted felon. That's correct. It was – I mean, when guns are recovered, they're typically either straw-purchased, obliterated serial number, or they are guns that have been reported stolen. So either a straw purchase not reported stolen, reported stolen, or obliterated serial number. This also, Your Honor, referred to what was the context of all of this. He was in constructive possession of the gun. The car was registered to him. He fled the police at 50, 60, 70 miles an hour with his lights cut out. That was consciousness of guilt evidence. There was also introduced at trial love letters that the defendant – that the defendant had written to Matthews after all of this, saying, you know, I love you and want to spend the rest of my life with you. And presumably somebody who had been framed would not be saying to someone who would – and even wrote those from federal prison. So, you know, it was – that was also evidence that this was his gun. So I think as the district court found, these two sentences would not have changed the verdict, just against the entirety of all the other evidence, would not have made a difference. Also, as the district court, which kept so much evidence out, the district court said that it would not have let the government go down this road, but if that had been made available and defense counsel had chosen to go down that road, the district could have said, well, that would have been, in its judgment, highly explanatory and prejudicial to the defendant. You know, as Judge Addis sort of pointed out on the juror issue, it doesn't matter whether the other reason makes sense or not. If that was the reason and it's not a Batson issue, then there's no Batson violation, for example. And there's no question about that. But of course, if a reason doesn't make sense, then you might think, well, that really couldn't have been the reason. Although, if you think that's the reason, then that's the reason. Fine. But why would a juror who is 70 years old be somebody that a prosecutor wouldn't want on a jury? I used to be a county assistant, first assistant prosecutor in New Jersey, tried jury trials. And I never took that out of my mind. In fact, I used to figure it would be better. Well, Your Honor, I share your sentiments. And actually, again, that was not my comment, but co-counsel's comment. But I agree with her in that, in this case, and this is why. Because, and the record reflects that she and I had discussed this, that in this case, by the time we got to trial, Don Matthews was a hot issue. And Don Matthews, we had turned over the impeachment material. She'd be called as a witness. She had admitted that she used cocaine daily or every other day at the time of this event. She had also said that she was getting it from the defendant, but that, of course, didn't come in. But she admitted that she was using cocaine. She was arrested for kidnapping her grandchild shortly before this event. Certainly, the evidence that was going to come in if she ended up testifying was that he had assaulted her. The prior assaults that he had committed against her did not come in, but it helps to explain her outrage. You know, I told you if you ever did this, she left out the word again at the instruction of the court. She was a woman who, despite having been beat up by him, got back together, despite him having a girlfriend, was having sex with him in hotels. I mean, all of that was going to come out. So Don Matthews, whose credibility was going to become important, was a woman who had used cocaine, who was having sex with someone who had a girlfriend, was having sex with someone who had beat her up, had stayed with someone who had beat her up, had got trouble with kidnapping before the trial. Those were open-ended charges of which she got cross-examined extensively at trial. An older, conservative juror might have very little patience for Don Matthews. So, you know, whereas a younger person, you know, in the government's thinking, maybe someone her age, someone might be a little more open-minded or might be a little more receptive to testimony from a person against whom all that impeachment material was going to come out. The district court here heard the reasons. The district court found that they were not pretextual. So the district court made a finding there was no discrimination, and that stands. There was no discrimination. As I noted in my brief, we knew at trial only of one defense witness, and that was prior to trial, we only knew of one defense witness, and that was Phil Carroll, who was a white male. Don Matthews would essentially become our witness if we called her or if they called her and we tried to turn that to our advantage. Don Matthews was an African-American female. The police officers involved were both African-American and white. The government would have no reason. I mean, the government would not use its strengths, racially anyway, but the government certainly would have no reason to do so in this case. Okay. Thank you. Thank you. Ms. Derby? The government's ignoring that they didn't turn over Corporal Sidebotham's reports either. I would also say that they stated as their reason in the court below that it didn't turn the reports over because it didn't intend to call Fidler or Matthews Robinson at trial at the time they made that decision. But, of course, by the time the trial came around, they had decided to call Ms. Robinson and they didn't turn over some of the documents she had filed or what she had said to Sidebotham. The government keeps arguing to you all this other evidence that it has in its files that didn't go in front of the jury, and that's just really not how you all can make the decision about whether this fatally tainted and polluted this trial. And I think Judge Fisher put his hand right on the important point. The government argued that she didn't tell the police, and if she didn't tell the police right away, that was an inference the jury could draw that she wasn't trying to frame him. But they argued it. They didn't correct it when she said she didn't tell anyone until she told Flagler when they stopped him, whereas they had this evidence in their files that they hadn't given to the defense that she had told people earlier. And you can't allow the government to play this kind of grave. There was nothing in the record that trial counsel was aware of that report, is there? No, absolutely not. Trial counsel had asked for those reports and some of them were turned over, but these important ones were not. And I think we have to go back to the old cases where the Supreme Court said in Meserash that this is beneath the dignity of the federal courts to allow convictions to stand when the government engages in conduct that's inconsistent with the orderly administration of justice. But you're not saying here that their conduct was intentional. Their conduct had to be intentional at some point, Your Honor, when they elicit from their witness that she didn't tell anyone until she told Flagler when they apprehended Mr. Edwards. And they knew, as she just said, that they had all these reports, the dispatch mentioning the gun, Fribbler mentioning the gun. They knew these or they should have known them. And if they didn't know them, then they were reckless in not reviewing their evidence before making that argument and eliciting their testimony. Is there any case law that changes the standard if the record would show that the government knew or should have known that the report existed? Is there anything there that is said that makes it a different test? If the government knew or should have known, it doesn't matter if it's intentional, if it's inadvertent, if they knew or should have known. Okay, but doesn't it go back to the same Brady-Giglio test? Was there a reasonable probability of a different result? Right, and in this case, Your Honor, if it had just been not turning over that evidence, I would have a weaker case. But in this case, they elicited evidence from their witness that was contrary to the police reports, and they argued it repeatedly to the jury. That makes it colluding and changing the trial. But you're not saying they did it intentionally. Your Honor, I don't know what is in their mind. You don't make that claim. I believe they did it with reckless disregard at the very least. Would you let me ask my question? Sure, Your Honor. You don't make that argument in your appeal? Your Honor, it's the same kind of argument, actually, that they're making about whether Mr. Edwards knew he had a gun. I can't prove that they intentionally went out to do this, but the fact is they had the evidence, they had read it, and then they went and argued something to the contrary to the evidence that they had. I just wanted to also direct Judge Alliser. I did talk about constructive possession at pages 48 and 49 of my brief with all of the precedent that I have there is that it has to be knowing possession, knowing constructive possession. So I would just say to sum up, there's enough wrong with this trial, Your Honors, that it shouldn't be allowed to stand. Mr. Edwards should either get a new trial or the court should decide that the reckless misconduct of the prosecution means the case should be dismissed. Thank you, Ms. Taylor. Thank you. We thank both counsel for excellent arguments, and the court will take the matter under advisory. Thank you.